IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| In re: | ) | Case No. BK25-80366 |
| | ) | |
| RICHARD N. BERKSHIRE, | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |

### Order Sanctioning the Debtor

THIS MATTER is before the court on the motion filed by the Chapter 11 trustee, now Chapter 7 trustee, seeking sanctions against the debtor Richard Berkshire. Trial on the trustee's motion (Doc. #362) was held on February 13, 2026. James Bachman appeared for and with the debtor Richard Berkshire. Michael Eversden and James Powers appeared for and with Lauren Goodman, the Chapter 7 trustee.

The debtor is sanctioned because he violated both the automatic stay and the court's orders requiring turnover.

### Findings of Fact

The debtor filed his bankruptcy petition on April 18, 2025, after a $2,666,767.74 judgment for breach of fiduciary duties was entered against him in state court.[1] A second breach of fiduciary duty lawsuit regarding a trust was pending at the time the debtor filed his bankruptcy case.[2] As a result of the debtor's pre-petition and post-petition conduct, the debtor was

---

[1] The judgment was in favor of the debtor's sisters. The debtor "repeatedly breached fiduciary duties" regarding a partnership, including the duties of loyalty, care, and good faith and fair dealing. The debtor used partnership assets to "funnel money to himself and friends," commingled accounts, obtained unnecessary loans, provided incomplete and inaccurate accountings, and spent partnership funds for "no legitimate business or partnership purpose."

[2] The county court entered a judgment finding the debtor breached duties of good faith, loyalty, impartiality, prudent trust administration, record keeping and safeguarding, and to inform and report. The debtor made unauthorized payments to himself and others from a trust, even after the debtor assured the court he would not make the payments from the trust without court approval.

removed as a debtor in possession.[3] Lauren Goodman was appointed Chapter 11 Trustee on July 10, 2025. The debtor's case was converted to Chapter 7 on February 6, 2026. Ms. Goodman was then appointed Chapter 7 Trustee.

The bankruptcy estate included two houses, one in Omaha, Nebraska, and the other in Kissimmee, Florida. The Omaha property, although titled in the debtor, was under construction for the debtor's son. Andrew occasionally stayed at the Omaha property during construction.

The trustee sought to liquidate both properties. The trustee convened a meeting at the Omaha property on August 18, 2025. Attendees included the trustee, her attorney Jay Koehn, a real-estate broker, and the debtor's counsel. Unbeknownst to the trustee, the debtor, who was on a personal trip to Africa, remotely monitored the meeting through video cameras he installed at the property.

*Unauthorized Occupancy*

When the trustee toured the Omaha property on August 18, the property was vacant. On September 17, 2025, the trustee filed a motion to compel turnover of possession of the property. (Doc. #188). The motion was granted September 24, 2025. (Doc. #204). The turnover order granted exclusive possession to the trustee and ordered the debtor to turn over the keys. The order also stated:

> If the debtor, Andrew Berkshire, or any third party interferes with the trustee's exclusive possession, without express written authorization from the trustee, the trustee is authorized to contact local law enforcement to enforce her rights of possession or to seek further relief from this court. Any action law enforcement takes in response, including citation or arrest, is expressly authorized by this order.

Sometime between the August 18 meeting and the order granting turnover, Andrew moved into the property. No one told the trustee until the day the turnover order was entered. The debtor emailed the trustee, informing her Andrew was "currently occupying and protecting the asset", purportedly to prevent vandalism. The trustee expressed concern Andrew was residing in

---

[3] This court found the debtor commingled bankruptcy estate funds with non-estate funds. He filed inaccurate schedules and operating reports, unnecessarily depleted estate assets, paid pre-petition debts without authorization, refused to fully comply with requests from the U.S. Trustee, and filed unconfirmable Chapter 11 plans not in good faith.

the property because the county had not issued a certificate of occupancy. She requested exclusive possession by the end of the week. She scheduled another in-person meeting at the property for the following Monday.

On Monday morning, September 29, 2025, the trustee's attorney, Mr. Koehn, and the debtor's attorney, Mr. Bachman, met at the property. The debtor and his son did not provide the keys. Instead, Andrew and his fiancée moved substantial amounts of furniture, clothing, and personal belongings into the house.

The September 29 meeting was contentious. Andrew refused to leave. He asked Mr. Bachman whether he was required to leave. Mr. Bachman shrugged and said, "It is what it is," and departed. Mr. Koehn waited in his vehicle for a locksmith. Andrew became aggressive. Mr. Koehn called the Omaha Police Department. Officers arrived and, after a spurious legal argument from Andrew, the police instructed Andrew to leave. But Andrew could not physically move all his property out that day. Having no other option, Mr. Koehn agreed to give Andrew and his fiancée additional time. Before he left, Mr. Koehn recorded videos of the property. He departed at approximately 3:30 p.m. In the following days, Andrew moved out under the supervision of a security company the trustee hired. The security company invoiced the bankruptcy estate $1,170.47.

After Andrew vacated, the trustee inspected the property. She discovered numerous operational video cameras, along with a modem and wireless router transmitting video feeds. The trustee unplugged the equipment. Someone subsequently broke in and reconnected the cameras. The trustee disconnected the equipment again. This sequence recurred multiple times.

The trustee hired a professional cleaner to clean the property on November 24, 2025. In late December 2025, the trustee visited the property and found evidence someone entered without authorization: dirt tracked on the newly cleaned floors, interior security cameras plugged back in, lights turned on, and the garage door unlocked. The trustee suspected the debtor entered using garage door openers. On December 29, 2025, the trustee emailed debtor's counsel inquiring. She received no response. She followed up on December 30 and again on December 31, 2025. No response.

On January 2, 2026, the trustee met with a garage-door contractor at the property. They discovered a hole drilled in an exterior basement door, covered by a plate, which plate was painted to match the color of the door. The hole

allowed access to the house. The trustee filed a police report and secured the compromised door.

At trial, the debtor admitted he authorized his son to reside in the house after the trustee was granted exclusive possession. The debtor denied personally visiting the property. But his testimony was inconsistent, alternating between "No", "Maybe", and "I don't recall". Initially, the debtor testified he had not visited the property after August 18, 2025. He later acknowledged he may have been there between August 18 and November 19, 2025, and may have reconnected cameras during those visits. He denied cutting the hole, covering it, or painting it. He did not know who did. He speculated third parties or contractors broke in and activated the cameras.

### Post-Petition Mechanics' Liens

The trustee conducted a lien search on the Omaha property and discovered five construction liens were filed post-petition. Andrew filed one of the liens in the amount of $456,240. The other liens were filed by contractors the debtor hired after he filed his bankruptcy case.[4] But the debtor, who is not operating a construction business, did not request court approval to obtain credit, incur unsecured debt, or incur secured debt. Nevertheless, the debtor encouraged three of the lienholders to file liens. He also notarized their liens.

### Florida Property

The trustee marketed the Florida property in October 2025. The court approved the sale in January 2026. Before the sale closed, the debtor called the real estate broker and told her "I can't tell if the property is under contract or not." "None of it's been approved by the bankruptcy court." He continued, "we're expecting the bankruptcy judge to terminate the trustee and so I think things will go in a different direction in the next few weeks." Although the debtor filed a motion to remove the trustee, the motion was denied.

---

[4] Andrew filed his lien on August 27, 2025, in the amount of $456,240. Andrew's lien states services were provided through August 17, 2025. Home Pride Contractors filed a lien for $4,800 on October 7, 2025, with a final services date of July 18, 2025. Andrew hired Home Pride on the debtor's authority. The debtor notarized three liens, each of which is on the same form, and filed October 31, 2025, with a last services date of July 4, 2025. They include $32,250 by Mike Peters, $40,360 by Monte LaFleur, and $40,175 by Victor Kirkland.

*IRA Withdrawals*

On October 16, 2025, the court entered an order finding that the debtor's IRA is exempt under 11 U.S.C. § 522(b)(3). As part of the order, the court noted:

> the debtor may withdraw and expend the IRA funds (or leave them where they are) without further leave of court. Any withdrawal or expenditure is without prejudice to a claim it became property of the estate as after acquired property.

(Doc. #244). On October 17, 2025, the debtor withdrew $120,000 from his IRA.

After the debtor withdrew funds from his IRA, the Chapter 11 trustee claimed the funds as property of the estate. The debtor immediately filed a motion asking the court to stop the trustee seizing the IRA withdrawals. On October 29, 2025, the court entered an order finding withdrawn funds lose their exempt status if not timely rolled over into another IRA. It also held once the withdrawals lost their exempt status, they became property of the debtor's estate under 11 U.S.C. § 1115.

During the hearing on the debtor's IRA withdrawals, the debtor requested funds to defend and appeal state court claims, which claims were claims against the debtor's bankruptcy estate. The trustee, lacking funds, declined to defend the litigation. The court authorized the debtor to withdraw funds for living expenses and defense costs, against which the trustee could not levy. The debtor was authorized to withdraw up to $10,000 each month for living expenses, and up to $45,000 for attorney's fees to fund two items of litigation, and another $50,000 if an appeal was taken. (Doc. #258). The court then ordered:

> Other than the items approved above, the debtor must inform the Chapter 11 trustee of withdrawals from the IRA at the time they are made, including the amount, proposed use, and accounts to which the withdrawn funds are deposited. Despite the exempt status of the IRA, because the funds can lose exempt status at some point after a withdrawal, the Chapter 11 trustee is entitled to information regarding the IRA from both the debtor and the IRA custodian, U.S. Bank.

(Doc. #258). At the time of the hearing the debtor had already withdrawn $120,000, which he did not disclose. On November 4, 2025, the debtor

withdrew another $50,000. On January 13, 2026, he withdrew $149,000, which including the earlier $120,000, totaled $319,000 in withdrawals. The trustee contends the debtor did not fully disclose all withdrawals.

Among the uses of the funds, the debtor testified he paid for utilities, food, gas, and general living expenses. He paid expenses related to the Florida and Omaha properties. He paid his legal secretary and his personal assistant. He also paid for two personal trips to Las Vegas. He attended a college football bowl game and the Super Bowl. He refused to provide a more comprehensive accounting of expenditures.

*Damages*

The trustee seeks civil contempt and sanctions including attorney's fees and costs of $30,453, the payment to the security company overseeing Andrew's move out of $1,170.47, and $128 charged by the garage door company. The total attorney fees to obtain possession of the Omaha property, to investigate the unauthorized liens, and in bringing the motion for sanctions total $22,764.50. The attorney fee application includes $3,090.50 in fees which precede the court's turnover order, $3,977 for administrative tasks,[5] and $621 solely to investigate the debtor's IRA withdrawals.[6]

**Conclusions of Law**

The trustee seeks relief under two separate legal theories. The trustee asserts the debtor should be held in contempt of the court's turnover order and the order requiring disclosure of IRA withdrawals. The trustee also asserts the debtor violated the automatic stay and should be held accountable for the violation under 11 U.S.C. § 362(k).

The standard for civil contempt is an objective one. "In our view, these provisions authorize a court to impose civil contempt sanctions when there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful." *Taggart v. Lorenzen*, 587 U.S. 554, 559–60 (2019) (applying

---

[5] For purposes of this order, all tasks performed by the Chapter 11 trustee are deemed administrative except the entries dated September 29, October 1, and October 3, 2025, November 12 (correspondence), and January 2, 2026. The work billed by Jay Koehn on August 17, August 26, and August 28, 2025, and the time billed by Michael Eversden on August 24, 2025, do not clearly appear to relate to injury or damage caused by the debtor.

[6] These fees include charges by Michael Eversden on January 5, 6, and 20, 2026.

civil contempt to violation of a discharge order). "[A] party's subjective belief that she was complying with an order ordinarily will not insulate her from civil contempt if that belief was objectively unreasonable." *Id.* at 561–62. Although *Taggart* addressed contempt for violation of a discharge order, courts apply the same objective standard to remedies for stay violations under § 105(a).

The automatic stay arises by statute, not court order. Under the Bankruptcy Code the automatic stay:

> operates as a stay, applicable to all entities, of—

> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

> (4) any act to create, perfect, or enforce any lien against property of the estate;

> (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title.

11 U.S.C. § 362(a).

"The stay is 'applicable to all entities,' including the Debtor." *In re Benitez*, 611 B.R. 106, 108 (B.A.P. 8th Cir. 2020). The consequences for violating the stay can be significant.

> [A]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. § 362(k). "The standard for a willful violation of the automatic stay under § 362(k) is met if there is knowledge of the stay and the defendant intended the actions which constituted the violation." *Cox v. Andrews (In re Andrews)*, 467 B.R. 173, 189 (Bankr. E.D. Ark. 2011) (quoting *Fleet Mortg. Grp., Inc. v. Kaneb (In re Kaneb)*, 196 F.3d 265, 269 (1st Cir. 1999)). "A willful violation does not require a finding of specific intent." *Carter v. First Nat'l Bank of Crossett (In re Carter)*, 502 B.R. 333, 336 (B.A.P. 8th Cir. 2013) (quoting *Associated Credit Servs. v. Campion (In re Campion)*, 294 B.R. 313, 316 (B.A.P. 9th Cir. 2003)).

Applying these standards to this case, there is no question Mr. Berkshire knew the stay was in effect. He was served a copy of the order and was on notice of its terms. The turnover order clearly and unambiguously instructed the debtor and his son to turn over the house to the trustee, and to give her exclusive possession. The order even authorized the trustee to contact law enforcement if either the debtor or his son violated the order. He was also served a copy of the IRA order.

The debtor violated both the automatic stay and the turnover order. There is no objectively reasonable basis to conclude the debtor's conduct was lawful under the automatic stay or the turnover order. The debtor, who is an attorney, admitted he authorized his son to occupy the property after the stay was in effect and after the turnover order was entered. This authorization is an act *by the debtor* to obtain possession or control of property of the estate, violating both 11 U.S.C. § 362 and the turnover order. Empowering his non-attorney son directly and proximately led to successive trespasses, culminating in either the debtor or his son drilling a hole in a door and breaking into estate property. The debtor's testimony on the break-in was inconsistent. Was he involved? "No." "Maybe." "I don't recall." Some intruder drilled a hole in the basement door. The only thing the intruder did was plug in security cameras which only the debtor could monitor. Even if the debtor did not personally drill the hole, the debtor directed or authorized it. The evidence that the only purpose served by the break-in was to reconnect cameras accessible solely to the debtor supports the conclusion the debtor directed or authorized the entry.

The debtor also violated the automatic stay, but not the turnover order, by causing liens to be filed against the estate. The stay prohibits "any act to create, perfect, or enforce any lien against property of the estate." The debtor has repeatedly argued the lien filings did not violate the stay under *Dapec, Inc. v. SBA (In re MBA Poultry, LLC)*, 291 F.3d 528 (8th Cir. 2002). *Dapec* involved a dispute regarding priority of liens recorded pre-petition. It does not stand for the proposition argued. The debtor also argues the stay was not violated because a notice of commencement was filed. Under Nebraska law if a lien is recorded after a notice of commencement is filed, the lien "attaches as of the time the notice is recorded". Neb. Rev. Stat. § 52-137(2). Attachment is a priority concept. The automatic stay prohibits any act to "perfect" a lien. Perfection occurs when the lien is filed. The liens were all filed post-petition.

The next issue is the appropriate sanction. This depends on the authority for the sanction. The trustee seeks to hold the debtor in contempt for violating

the automatic stay. She also seeks damages and punitive damages under § 362(k). But the trustee acting on behalf of the bankruptcy estate cannot recover damages under § 362(k). The section allows an *individual* to recover damages for willful violations of the stay.

> As the Second Circuit persuasively explained, this construction of § 362(h) [now 362(k)] is required by the plain meaning of the word "individual," as used in the Bankruptcy Code, supported by the fact that § 362(h) was added to the Code as part of the "Consumer Credit Amendments" of 1984. We reject earlier, contrary circuit decisions that did not give adequate weight to the statute's plain meaning.

*Sosne v. Reinert & Duree, P.C. (In re Just Brakes Corp. Sys., Inc.)*, 108 F.3d 881, 884–85 (8th Cir. 1997).

The trustee does not act in an individual capacity. She represents the bankruptcy estate. There is a "divergence in the courts as to whether the term 'individual' is expansive enough to encompass the trustee of a debtor's estate." *Andrews*, 467 B.R. at 189–90. The trustee was not individually injured. Under the plain meaning of the statute, she cannot recover damages under § 362(k). Because § 362(k) is the only vehicle through which punitive damages can be awarded, the trustee cannot recover punitive damages from the debtor.

The court can hold the debtor in contempt for violating court orders, but it cannot hold the debtor "in contempt" for violating the automatic stay.

> [B]ankruptcy courts have broad equitable powers to remedy violations of the automatic stay that injure a corporate debtor's estate. Many courts have said that those who violate the automatic stay "may be held in contempt." Calling this remedial power contempt overlooks a serious question whether bankruptcy courts have contempt powers after the 1984 Amendments. More narrowly, it overlooks the fact that contempt is a remedy for violating court orders, not statutes. Finally, even if a civil contempt power exists, we see little if any need to resort to it in this context because § 362(a), buttressed by § 105(a), confers broad equitable power to remedy adverse effects of automatic stay violations.

*Just Brakes*, 108 F.3d at 885 (citations omitted). In *Just Brakes*, the 8th Circuit remanded the case to determine whether the estate was damaged. In remanding the case, the 8th Circuit did not "foreclose the bankruptcy court

from returning to the question of remedy" if a "violation of the automatic stay has needlessly cost the estate delay and litigation expense." *Just Brakes*, 108 F.3d at 886. The precise label for this remedial power is unsettled, but it is not contempt.

The debtor not only violated the automatic stay and the court's turnover order, he also damaged the bankruptcy estate through delay and obstruction. Sanctions are necessary and appropriate under § 105(a) and the authority recognized in *Just Brakes* to remedy the debtor's conduct regarding possession of the Omaha property and the liens filed against the Omaha property. The trustee is awarded $1,170.47 charged by the security company, $128 charged by the garage door company, and attorney's fees of $22,764.50. The trustee is not awarded damages for the IRA withdrawals or non-disclosure because the court's orders created some ambiguity as to the propriety of withdrawals and because the trustee did not establish damage.

Dated March 31, 2026

BY THE COURT:

/s/ Brian S. Kruse
Brian S. Kruse
Chief Bankruptcy Judge